Filed 7/19/13  In re R.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E057757 |
| Plaintiff and Respondent, | (Super.Ct.No. J233244) |
| v. | OPINION |
| A.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall and Cheryl C. Kersey, Judges.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

1

I

INTRODUCTION

Mother, A.M., appeals from the October 17, 2012, and December 11, 2012, orders denying mother's modification petitions and terminating her parental rights for R.M. (Welf. & Inst. Code, § 395.1.)[1]

I.M., an infant was diagnosed with biliary atresia, a congenital condition that could cause liver failure and necessitate liver transplant. While at the hospital, mother displayed mental health disorders. I.M. and R.M. were detained in separate placements. After reunification services were terminated, mother began domestic violence counseling and additional therapy. The juvenile court denied her section 388 petition. On the day of the section 366.26 hearing, mother filed another section 388 petition, which was again denied. I.M. was placed in long-term foster care as a medically fragile child and parental rights were terminated for R.M. so that she could be adopted by her caretaker. This appeal is from the denial of mother's two section 388 petitions and from the order terminating parental rights for R.M.

Mother asserts the juvenile court abused its discretion and erred in denying the section 388 petitions. Mother also argues the beneficial relationship exception was established and the court erred by not considering a legal guardianship instead of adoption. We conclude the record supports the orders of the juvenile court. We affirm.

---

[1] All statutory references are to the Welfare and Institutions Code.

II

FACTUAL AND PROCEDURAL BACKGROUND

*A. Prior Dependency History*

Mother has five children, with the youngest born during these proceedings. Her oldest child, A.M., born in 2001, is in the custody of his father due to a child dependency proceeding from 2001 to 2002, which arose when mother was arrested for public intoxication. Mother was convicted of child endangerment and incarcerated in 2004 and 2005. As a condition of probation, mother was not allowed to have any children in her custody. Her second child, M.M., was born in 2003 and placed in a legal guardianship with the maternal grandparents.

*B. Detention*

The original dependency petition was filed in June 2010 and alleged the parents' failure to protect because of mother's history of criminal endangerment, substance abuse, mental health issues; no provision for support; and abuse of sibling. (§ 300, subds. (b), (g), and (j).) R.M., born in 2007, was two years old and I.M., born in 2010, was five months old. The whereabouts of their fathers were unknown.

In May 2010, the San Bernardino County Children and Family Services (CFS) received an immediate response referral for severe medical neglect of I.M. from Loma Linda University Medical Center. When mother brought I.M. to Loma Linda for congestion, he was diagnosed with signs of jaundice and possible liver failure. I.M. needed to be tested for a condition known as biliary atresia, a serious ailment which

would require a liver transplant.  Mother resisted giving approval for I.M.'s surgical liver biopsy.

Dr. Klooster, I.M.'s attending pediatric gastroenterologist, expressed his opinion mother was not capable of understanding I.M.'s condition.  Dr. Klooster believed a court order was necessary to obtain consent for I.M. to have the necessary liver biopsy.  In telephone conversations, mother became aggressive and irrational, showing signs of paranoia and no concept of reality.  Removal of the children was necessary.  R.M. was placed with a nonrelative extended family member (NREFM) who had provided her with day care.  At the June 2010 hearing, the court found a prima facie case to detain the children.  Mother was granted monitored visitation.

C.  *Jurisdiction and Disposition*

After I.M. was discharged from the hospital, he was placed in a medically fragile foster home with a registered nurse.  Test results from the liver biopsy showed I.M. had biliary atresia and would need further evaluation for a liver transplant.  Mother may have changed pediatricians causing a delay in treatment and preventing I.M. from having a surgery to postpone the need for a liver transplant.  Mother maintained there was a misunderstanding and she knew I.M. had a serious medical condition and had insisted he receive medical attention even when Kaiser emergency room had assured her that I.M. was healthy.  Mother claimed she had taken I.M. to have a bilirubin test for jaundice in February and March 2010 and the doctor had recommended waiting until I.M. was four months old to run another bilirubin test.

4

Mother said she had switched insurance providers in March 2010 so that I.M. could be evaluated by different doctors and the change in providers took several weeks. The medical professionals confirmed mother had provided I.M. with appropriate care except for the delay from February to March 2010 in taking I.M. for the bilirubin test. Mother's medical eligibility worker confirmed that mother had frequent contacts with her and kept her updated as to I.M.'s medical condition. However, the eligibility worker also described mother as "very lost" in understanding I.M.'s treatment plan. Mother would have benefitted from an advocate to explain the medical procedures.

R.M. was a healthy, happy child with no medical complications or developmental delays. R.M. had received regular medical care since 2007 and was up-to-date on all her immunizations and physical exams.

CFS recommended the children be removed from mother and mother receive family reunification services. Mother's mental health remained a concern but her behavior was appropriate. Mother reported alcohol use in 2001 but denied current drug or alcohol use since then. She had stable employment at Kmart since 2008. Mother was also in a relationship with her boyfriend, Adrian, who was employed, and had an appropriate relationship with R.M. Mother agreed to participate in all necessary services to regain custody of her children.

Mother loved her children and was highly motivated. She had supervised visits, which were appropriate and loving. Upon mother's departure, R.M. cried and wanted to stay with mother. Mother was highly resourceful. In the past, she had found adequate

child care services, provided the children with routine health care, had stable employment, and effectively used public transportation.

In July 2010, mother was arrested for assault with a deadly weapon involving her boyfriend's ex-girlfriend. After mother was granted probation, CFS recommended she continue to receive services.

In October 2010, mother submitted to CFS's recommendations and the court made jurisdictional findings and disposition orders. The court sustained the allegations concerning mother's history of child endangerment, substance abuse, and mental health issues. The court declared the children to be dependent and ordered them removed from mother. The court ordered mother to receive family reunification services.

*D. Six-Month Review Hearing*

In April 2011, mother was living with her boyfriend and relying upon him and public assistance as her means of support. Mother could not continue working because of demands of her case plan including counseling, classes, and visitation. Her random drug tests were negative. A psychological evaluation concluded that mother had minimized her history but was also cooperative and showed no signs of delusions, cognitive impairment, or thought disorders. The psychologist recommended a medical evaluation by a psychiatrist and continued supervised visitation.

Mother and R.M. appeared to enjoy each other's company and were bonded when they were together. R.M. was enrolled in a preschool ready program and mother had signed her up for Head Start. I.M.'s health had slowly improved and he was being evaluated regarding contact with R.M.

6

The court found that mother had participated in her services, attended individual counseling, family counseling, and a parenting class, and completed a psychological evaluation. The court found mother had been cooperative and proactive in her case plan, was open to guidance, had made progress, and was attending therapy with R.M. The court ordered mother to have unsupervised overnight visits, not to exceed four overnights a week. CFS recommended that family maintenance services be offered to mother and that R.M. be allowed to return to mother's home.

At the April 2011 hearing, minor's counsel objected to R.M. going home with mother. The court permitted increased visitation but denied family maintenance and ordered mother to first have a psychiatric evaluation. In an incident on April 27, 2011, mother became upset and yelled at CFS staff because she was unable to get new gas cards for the month.

In May 2011, mother was having difficulties arranging transportation, appointments, and care. Mother's symptoms and inappropriate behaviors were increasing under the demands of parenting R.M. four days a week. Although mother wanted to parent her children, the social worker doubted her ability. It was reported that mother had yelled at R.M. during visitation and R.M. had accused mother of hitting her with a toy. R.M. had a mark on her upper arm but she could not describe the toy or say how the incident happened. Mother felt misunderstood and believed R.M. was mad because she did not go home with mother. Visitation was changed to supervised. CFS recommended R.M. remain in a concurrent planning home but that mother continue to receive services because of the likelihood of reunification.

7

At the hearing in May 2011, CFS withdrew its recommendation for family maintenance and asked for visits to revert back to being supervised. Over mother's objection, the court ordered supervised visits.

From May to July 2011, CFS continued to recommend R.M. remain in the concurrent planning home and mother receive services. Mother showed poor judgment. During a July visit, mother questioned R.M. about missing her and elicited uncomfortable, nervous laughter. R.M. said she did not want to return to mother's care. Mother continued to have difficulties communicating with others and to display persecution anxiety. CFS expressed ongoing concerns about mother's mental health and ability to parent. Although mother had participated in services, CFS still had concerns about mother's long-term mental health stability.

At the six-month review hearing in July 2011, the court authorized CFS to increase mother's visitation and for her to have some unsupervised visits and reunification services.

E. 12-Month Review Hearing

In October 2011, CFS recommended that R.M. remain with the foster mother. Although mother had complied with her plan and demonstrated improvements, CFS still questioned whether mother had gained enough skills and judgment to make decisions in the best interest of her children. R.M. called mother "mom" and the foster mother "mommy." R.M. appeared to enjoy mother's visits but was also happy to return to the foster mother. The foster mother was interested in adoption. R.M. and I.M. enjoyed monthly sibling visits but I.M. remained placed separately due to his special medical

needs. The court found the permanent plan of return to mother's home was appropriate but that R.M.'s placement remained necessary and mother's progress was moderate.

F. *18-Month Hearing*

In December 2011, mother and R.M. resumed overnight visits. R.M. struggled with the transition but also stated she wanted to return to mother "forever." R.M. seemed to be enjoying overnights with mother and I.M. On the other hand, R.M. was recounting "outlandish tales" about events at her mother's home to avoid returning there "forever." R.M. was receiving therapy. Mother had combined her visits with both children and was successfully managing appointments, obligations, and transportation. With continued support, mother could stabilize her mental health. The January 2012 report recommended R.M. return to mother's home with family maintenance services.

On January 19, 2012, the court authorized R.M.'s return to mother's home with family maintenance services. At the 18-month review hearing on February 21, 2012, the court adopted the recommendations of the January 19, 2012, report. R.M. remained home with mother with continued services. I.M. was also placed with mother on an extended three-week visit.

G. *Section 387 Petition*

In April 2012, CFS filed a petition under sections 342 and 387. The petition alleged that, on April 13, 2012, mother was arrested under Penal Code 273.5 for a domestic violence incident with her boyfriend. Adrian told the social worker the fight had begun when mother accused him of cheating and locked him out of the house. Mother was pregnant with their child and he did not want to press charges.

The court ordered R.M. detained from mother and returned her to the foster home of the NREFM, where R.M. adjusted well because she had lived there for nearly two years. Mother's visitation was changed back to being supervised.

On May 8, 2012, mother denied that she was the aggressor in the domestic incident. Mother claimed that the incident did not take place in front of the children and had never happened before. Mother served 18 days in jail and was placed on probation and ordered to complete a 52-week course. Mother had separated from Adrian but they were still in contact because of the pregnancy.

CFS recommended that no family reunification services be ordered for mother due to the lack of progress after two years of services. CFS also recommended the court order a section 366.26 hearing with the permanent plan of adoption for R.M., with the foster mother as the prospective adoptive parent.

At the hearing in June 2012, the court found clear and convincing evidence to remove R.M. from mother's home because mother had failed to complete her plan. Reunification services ended and the court ordered a section 366.26 hearing to consider the termination of parental rights. The court granted mother weekly supervised visitation for one hour. The court denied mother's counsel's motion to be relieved.

CFS requested decreasing mother's visitation to two times a month. CFS was concerned that mother was blaming the foster mother and refusing to cooperate in plans for a vacation and party for R.M. CFS asked to continue sibling visitation because R.M. and I.M. enjoyed seeing each other. Over mother's objection at a hearing on September 12, 2012, the court ordered mother's supervised visitation be reduced to twice per month.

10

The court denied a second motion for mother's counsel to be relieved.

*H.  Section 388 and Section 366.26 hearing*

In October 2012, mother filed a petition under section 388 requesting reinstatement of reunification services, documenting her attendance at counseling, therapy, anger management and domestic violence classes.  CFS responded that, even though mother was enrolled in counseling and therapy, she had not shown that she benefited from services in the past.  Furthermore, another domestic disturbance had been reported involving mother and her boyfriend on September 7, 2012.

Mother was absent at the October 17, 2012, hearing because she had recently given birth to her fifth child.  The court denied a request for continuance and also denied mother's section 388 petition without an evidentiary hearing.

The section 366.26 report concluded that R.M. was a healthy five-year-old girl with no medical or developmental problems.  R.M. had been placed in the prospective adoptive home since July 2010 and showed a strong attachment to her prospective adoptive mother, who had provided day care for R.M. before placement.  R.M.'s caretaker was committed to providing her with a permanent home.  R.M. was strongly attached to her prospective adoptive family and appeared happy and comfortable in their home.  In contrast, mother had maintained visitation with R.M. throughout the proceedings and their interactions were affectionate and appropriate.  Also, R.M. loved her brother I.M. and enjoyed visitation with him.

On the day of the December 11, 2012, hearing, mother filed a second section 388 petition again requesting reunification services.  Although the parties stipulated to the

11

bond between mother and R.M., the court found there was no change in circumstances and denied mother's petition. The court found it was in the best interest of the child to terminate parental rights for R.M. so that she could be freed for the permanent plan of adoption. I.M. remained in long-term foster care as the selected permanent plan.

Mother filed a notice of appeal from the court orders on October 17, 2012, and December 11, 2012, denying her section 388 petitions and terminating her parental rights for R.M.

## III

## SECTION 388 PETITIONS

*A. Standard of Review*

The appropriate standard of review for a denial of a section 388 petition is abuse of discretion combined with substantial evidence. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1065-1067.) Abuse of discretion means the trial court's decision is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 179-180; *In re Stephanie M.* (1994) 7 Cal.4th 295, 319.) Substantial evidence is evidence that is reasonable in nature, credible and of solid value. (*In re Lynna B.* (1979) 92 Cal.App.3d 682.) Viewing both standards together, the reviewing court will not reverse the trial court's decision unless, seeing the evidence in the light most favorable to the trial court's decision, no judge could reasonably have so ruled. (*Robert L.,* at pp. 1065-1067.)

Under section 388, a parent petitioning to reestablish reunification services needs to show a change of circumstances or new evidence, and establish that modification is in

12

the best interests of the child.  (§ 388, subd. (c)(1)(A); Cal. Rules of Court, rule 5.570(e)(1) and (h); *In re Andrew L.* (2004) 122 Cal.App.4th 178, 190.)  The court has two choices:  (1) summarily deny the petition or (2) hold a hearing.  (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 431.)  To avoid summary denial, the petitioner must make a "prima facie" showing of "facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited."  (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.)  Otherwise, the court may deny the application.  (*In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1450.)  On the other hand, if "a hearing would promote the best interests of the child, the court will order the hearing."  (*In re Heather P.* (1989) 209 Cal.App.3d 886, 891, *In re Lesly G.* (2008) 162 Cal.App.4th 904, 912.)

B.  *Denial of Request to Continue the October 2012 Hearing and Due Process*

The hearing on October 17, 2012, took place on a Wednesday morning.  Mother had given birth sometime on Monday and was hospitalized from October 15, 2012, to October 18, 2012.  The court denied mother's petition without any testimony because she was absent although the court was aware she had recently given birth.

On appeal, mother argues the court abused its discretion, denied her due process, and misapplied the applicable standard set forth in *In re Kimberly F.* (1997) 56 Cal.App.4th 519, by not continuing the matter to a new hearing date to allow her to appear, testify, and cross-examine witnesses.  Mother argues the court's error persisted when it summarily denied the second 388 petition in December 2012.

In determining whether a child's best interests are served by a continuance, the juvenile court considers three factors:  the need for prompt resolution and a stable

13

environment and the damage of a prolonged temporary placement. (§ 352; *In re Dolly A.* (1986) 177 Cal.App.3d 195, 199.) Here R.M.'s best interest would not be served by a continuance. R.M. was in the dependency system for nearly two and one-half years from June 2010 to October 2012. Mother was not making progress toward reunification. After the April 2012 episode of domestic violence, mother's services had been terminated. The statutory time limits had expired. Mother may have recently given birth but that did not offer a reason to continue the section 388 hearing when the court had already announced it would deny the petition. R.M. could only be damaged—not benefited—by a continuance in the hearings on sections 388 and 366.26.

In addition, mother contends she was deprived of her due process right to confront and cross-examine witnesses, such as the caseworker and persons whose hearsay statements are contained in the reports. (*In re Lesly G., supra*, 162 Cal.App.4th at pp. 913, 915; Cal. Rules of Court, rule 5.570(h)(2)(B)(i).) In this regard, however, due process only operates if there are material conflicts in the evidence or material issues of credibility. (*In re Clifton V.* (2001) 93 Cal.App.4th 1400, 1404-1405.) Those considerations do not apply here. It is undisputed that mother continued to participate in various programs and therapy, as she alleges in both her section 388 petitions. But it is also undisputed that mother continued to be involved in domestic violence with her boyfriend in April and September 2012 and she could no longer qualify for services because of statutory limits. Thus, mother was not denied due process when the court refused to continue the October 17, 2012, hearing. The same analysis applies to mother's

14

arguments about the court's denial of the second 388 petition in December 2012. It was not an abuse of discretion to deny either petition.

*C. Changed Circumstances and Best Interests*

As to the merits of her section 388 petitions, mother contends modification would have been in the best interest of R.M. because mother had maintained regular visitation, complied with all of her services, and had shown changed circumstances. Mother consistently visited and completed requested services: "Visitation and compliance with the reunification plan should be indicia of progress toward family preservation." (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1790.) Due to her efforts to comply with the court orders and take additional classes on her own initiative, mother asserts her circumstances were changed and were not merely changing. (See *In re Hashem H.* (1996) 45 Cal.App.4th 1791, 1799.)

In considering changed circumstances, the court should evaluate: (1) the seriousness of the problem which led to the dependency; (2) the strength of relative bonds between the dependent children to both parents and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. (*In re Kimberly F., supra*, 56 Cal.App.4th at p. 532; *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 446-447.) Mother contends that her petitions met all of the *Kimberly F.* factors.

As to the first and third prongs, mother maintains there was a reasonable basis to conclude that mother was recognizing and addressing the problems which caused the dependency and the ongoing issues. Mother had reunited with both her children before

15

the April 2012 incident.  In September 2012, she had completed 32 hours of anger management and obtained domestic violence counseling.  Mother was also enrolled in a domestic violence/anger management program.  "Dependency proceedings are not simply a conveyor belt leading to the termination of parental rights."  (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 676.)  If the evidence suggests that despite a parent's substantial history of misconduct, there is a reasonable basis to conclude that the relationship with the current child could be saved, the court should always attempt to do so, as "the primary focus of the trial court must be to *save* troubled families, . . ."  (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464; *In re Albert T.* (2006) 144 Cal.App.4th 207, 218.)

Unfortunately, the record also shows that mother and her boyfriend were involved in domestic violence again in September 2012 and also on other occasions that had not been disclosed to CFS.  Therefore, in spite of mother's ongoing participation in programs lasting for more than two years, she was not successful in remediating her problems.  Although the court did not reach the issue of the parent-child bond, it is not disputed that mother and R.M. were close.  But, based on that alone and in view of mother's other failures, mother did not establish changed circumstances.

Furthermore, the record does not support it would be in R.M.'s best interests to grant the section 388 petitions.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317, 320.)  R.M. was removed when she was two years old.  By December 2012, she had been out of mother's home for almost 30 months.  She was happy and "fully integrated" with her

16

foster family. R.M.'s need for continuity and stability made it in her best interest to deny mother's petitions and move forward with a permanent plan.

IV

PARENTAL BENEFIT EXCEPTION

Mother argues that, based on the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i)), the court should not have terminated her parental rights. Mother asserts R.M. would benefit from a continued relationship with mother through legal guardianship instead of adoption. We disagree.

Adoption is the preferred permanent plan because it is more secure and permanent than legal guardianship and long-term foster care. (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206-207.) At the section 366.26 hearing, if the juvenile court determines by clear and convincing evidence that the child is likely to be adopted, the court is statutorily required to terminate parental rights unless there is a compelling reason for finding that termination of parental rights would be detrimental under one of the six exceptions enumerated in section 366.26, subdivision (c)(1)(B). (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 291.)

The burden of establishing an exception to termination rests with the party claiming the exception applies. (*In re Daisy D., supra,* 144 Cal.App.4th at p. 291.) One of those circumstances is section 366.26, subdivision (c)(1)(B)(i), where a parent maintained regular visitation and contact, and the child would benefit from continuing the relationship to such a degree that the child would be greatly harmed by termination. (§ 366.26, subd. (c)(1)(B)(i); *In re Casey D.* (1999) 70 Cal.App.4th 38, 53; *In re S.B.*

17

(2008) 164 Cal.App.4th 289, 297.) Courts examine the beneficial relationship exception on a case-by-case basis, taking into account the many variables which affect a parent-child bond. "The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent-child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) A juvenile court must balance the strength and quality of the natural parent/child relationship in a tenuous placement against the security and sense of belonging, a new family would confer. If severing the natural parent-child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome. (*Id.* at pp. 575-576.)

Courts apply a composite standard of review that incorporates both the substantial evidence and the abuse of discretion standards of review when reviewing a juvenile court's determination regarding the applicability of a statutory exception to termination of parental rights. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1314; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) The *Bailey J.* court observed that the juvenile court's decision whether an adoption exception applies involves two component determinations: a factual and a discretionary one. The first determination, because of its factual nature involving the existence of a beneficial parental relationship, is properly reviewed for substantial evidence. (*Bailey J.,* at p. 1314.) The second determination calls for the juvenile court to determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh

18

that against the benefit to the child of adoption. That determination is appropriately reviewed under the deferential abuse of discretion standard. (*Id.* at p. 1315.)

It is not disputed that mother maintained regular visitation and contact with R.M. The issue is whether the benefit to R.M. is greater than the value of a stable permanent home. If a juvenile court determines that a parent has "'maintained regular visitation and contact'" and there is a "'substantial, positive emotional attachment'" between child and parent benefitting the child, and that the benefit from continuing that parent-child relationship in a tenuous placement "'promotes the well-being of the child to such a degree as to outweigh'" the benefit that child would gain from the stability and permanency of adoption, then the parent-child relationship exception is established. (*In re C.B.* (2010) 190 Cal.App.4th 102, 129.)

The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) In *In re K.P., supra*, 203 Cal.App.4th 614, the juvenile court found that the bond between mother and K.P. was not "strong enough" to rise to the level meriting the application of the parental relationship exception to the termination of parental rights because it did not constitute the type of parental bond necessary that the child would benefit from continuing this relationship as compared to the advantages of adoption. (*Id.* at p. 623; *In re C.F.* (2011) 193 Cal.App.4th 549, 545.)

Here R.M. had a close relationship with mother but she was most content and secure in her placement with her foster mother. The existence of a parent-child

19

relationship is not a compelling enough reason against terminating parental rights because mother is demonstrably incapable of parenting R.M. in a sustained, responsible way. Mother has five children and she is a parent to none of them. Over several years, mother had worked to improve her parenting skills and the ability to care for her children. But, in April and September 2012, mother was still struggling with the issue of domestic violence that had appeared in July 2010. It was not an abuse of discretion to terminate parental rights. For the same reasons, we do not agree a legal guardianship would be the better alternative to adoption. (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1533-1534, 1536-1538.)

V

DISPOSITION

The juvenile court did not abuse its discretion or otherwise err in denying the section 388 petitions. No beneficial relationship exception was established. Adoption, not a legal guardianship, is the preferred plan. We affirm the orders of the juvenile court denying mother's section 388 petitions and terminating her parental rights.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

HOLLENHORST
J.

20